1

1             UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF KENTUCKY
2           NORTHERN DIVISION AT COVINGTON
                    - - -
3
UNITED STATES OF AMERICA,      :  Docket No. 16-CR-47
4                              :
                 Plaintiff,    :  Covington, Kentucky
5                              :  Wednesday, April 12, 2017
        versus                 :  2:04 p.m.
6                              :
WILLIAM J. MILLER,             :        **VOLUME I**
7                              :
                 Defendant.    :
8

                    - - -
9
            TRANSCRIPT OF MOTION HEARING
10     BEFORE MAGISTRATE JUDGE CANDACE J. SMITH

11                  - - -

12 APPEARANCES:

13 For the United States:      ELAINE K. LEONHARD, ESQ.
                             U.S. Attorney's Office
14                           207 Grandview Drive
                             Suite 400
15                           Ft. Mitchell, KY 41017-2762

16
For the Defendant:           ERIC G. ECKES, ESQ.
17                           455 Delta Avenue
                             Suite 105
18                           Cincinnati, OH 45226

19
Transcribed By:              JOAN LAMPKE AVERDICK, RDR, CRR
20                           Official Court Reporter
                             35 W. Fifth Street
21                           Covington, KY 41011

22

23

24
    Proceedings recorded by electronic recording, transcribed
25 via computer.

1          (Proceedings commenced at 2:04 p.m.)

2               THE COURT:  All right.  Madam Clerk, would you call

3     the matter set for oral argument, please.

4               DEPUTY CLERK:  Covington criminal 16-47, United

5     States versus William J. Miller.

6               THE COURT:  Okay.  Let's see here.  Let's go ahead

7     and have appearances.

8            Ms. Leonhard, you are here for the United States?

9               MS. LEONHARD:  I am.  Good afternoon.

10              THE COURT:  Good afternoon.  Mr. Eckes?

11              MR. ECKES:  Eric Eckes on behalf of Mr. Miller, who

12    appears today, Your Honor.

13              THE COURT:  All right.  And the Court does recognize

14    Mr. Miller here as well.  Okay.

15         So, Counsel, of course I did set this for oral argument,

16    but thought we'd take a moment here and just update on if

17    there's been any change or progression in the scheduling or

18    anything of that nature.

19              MR. ECKES:  Your Honor, I've spoken with my experts

20    and said a date -- two dates.  They expect it to take two

21    days.  So within the same week, there was two two-day periods

22    sent to the FBI.  So one problem solved.  I'll just get to

23    that first, since we have one problem solved.

24              THE COURT:  Okay.

25              MR. ECKES:  The Google warrant returned is on site in

3

1    Indianapolis.

2              THE COURT:  Okay.

3              MR. ECKES:  We were able to accomplish that.  So what

4    I'm now being reported just now is that there may be a

5    conflict with the two dates that were suggested.  Those were

6    going to be April 25th.  That week is when I was hoping to

7    have the examination done.

8              THE COURT:  Okay.

9              MR. ECKES:  But now we're trying to figure out other

10   possibilities.

11       The reason those dates were fairly specific were related

12   to my expert's calendar and being nearby in Indianapolis and

13   trying to kill two birds with one stone and lower costs.

14             THE COURT:  Okay.

15             MR. ECKES:  But it is what it is.  We have to find

16   dates that work for everybody.

17             THE COURT:  Okay.  So we're -- you were looking at

18   the 25th, but it doesn't look like it's going to work out for

19   that week?

20             MR. ECKES:  I'm just now being -- that's just now

21   being reported to me momentarily.

22             THE COURT:  Okay.  Ms. Leonhard?

23             MS. LEONHARD:  It might; it might not.  I have been

24   cc'd on the e-mails between Mr. Eckes and the HSI special

25   agent --

4

1          THE COURT:  Okay.

2          MS. LEONHARD:  -- in Indianapolis who conducted the

3     forensic review on the government's behalf.  And he sent me an

4     e-mail earlier this morning that indicated that those dates

5     that have been proposed by Mr. Eckes and his experts, he is

6     not available.  However, he did advise that he is looking into

7     the logistics of copying the images onto a drive --

8          THE COURT:  Okay.

9          MS. LEONHARD:  -- and making those available at the

10    HSI or ICE office here locally --

11         THE COURT:  Locally.

12         MS. LEONHARD:  -- in Ft. Mitchell.  The only

13    potential problem with that is he, as the examiner, would not

14    be on site, and I don't know how much sort of facing up the

15    experts do with each other when they're doing these types of

16    things.

17         THE COURT:  Okay.

18         MS. LEONHARD:  Essentially, just my case agent,

19    Special Agent McGrath, would be there overseeing things; but,

20    of course, she is not a forensic examiner.

21      So I have not heard back from Special Agent Johnson.  He

22    just advised me that the dates proposed don't work; that he's

23    looking into alternatives.  And I just had asked him to let me

24    know when he finds something out and makes a decision.

25         THE COURT:  Okay.  All right.

1          Anything further, Mr. Eckes?

2          All right.  So we'll keep our fingers crossed that we can

3     get this set soon.  But it sounds like the -- while I

4     appreciate, on behalf of the courts, the taxpayers, I guess,

5     the efforts to keep the costs down and to do this on a

6     double-booking basis, so to speak, while they have to travel

7     out of town, if it turns out that it's here locally, that

8     might solve that problem and actually make more dates

9     available for you folks then as well.  So one way or the

10    other, it sounds like you all will be able to come up with a

11    date soon here, so that's good progress and I appreciate the

12    updated report on that.

13         We do probably need to talk about, though, from a

14    scheduling standpoint then, before we turn to the motion, what

15    to do next here in the way of scheduling; if this is something

16    that your-all's thoughts are to perhaps file some sort of a

17    status report or when you're ready to come back before the

18    Court to see about setting a trial date, or what are your

19    thoughts in that regard?

20             MR. ECKES:  I certainly would agree with that option,

21    Your Honor.  I mean, we can -- Mr. Miller's very aware of the

22    Speedy Trial; that there is his rights, there's the public's

23    right that we've talked about; that, you know, with the

24    suppression going on and our need to present a defense and to

25    examine the evidence.  He understands that, and he's willing

6

1    to, in open court, waive his speedy trial right until the date

2    whereby we set the date or come back before the Court.  And

3    I --

4              THE COURT:  Does he also understand that even, in

5    addition or aside from waiver, that those are time frames that

6    are excluded under the Act anyway?

7        You have a general 70-day trial clock, Mr. Miller.

8              THE DEFENDANT:  Yes.

9              THE COURT:  Every defendant does.  But there are a

10   host of situations, circumstances, that come up in a case that

11   can hold the time, basically, or the time is excluded from

12   that 70-day clock.  So while you have the suppression motion

13   pending, for example, that's excluded from your time clock.

14   The circumstance with appointment, choosing of experts, the

15   expert's examination and so forth, that's excluded from your

16   clock.

17       So you understand all of that as well?

18             THE DEFENDANT:  Yes.

19             THE COURT:  Okay.  All right.  And so if I do not set

20   a trial date for you today and I wait to hear from counsel

21   that they have been able to make arrangements for a date for

22   the experts, your expert, to view the materials and so forth

23   to go through the computer, are you agreeable with that?

24             THE DEFENDANT:  Yes, ma'am.

25             THE COURT:  Okay.  All right.

1        What about the United States?  Ms. Leonhard, is that

2   agreeable with you, to have you all file a status report or a

3   request for a status conference once you have a date agreed

4   upon for the examination and, preferably, Mr. Eckes, when

5   you've also had a chance to confer with your expert about the

6   timing, how long it's going to take to get some initial

7   results back to you and so forth?

8        Okay?  Is that agreeable with the United States?

9            MS. LEONHARD:  Certainly.

10           THE COURT:  Okay.  All right.  So we'll go ahead and

11  include that in the minute entry.  And it doesn't matter to me

12  if you file it as a status report or as a motion for a status

13  conference.  Either way, it will get back on my radar screen,

14  and then I will go ahead and bring you all in so we can see

15  about getting a trial date set in the case that's workable for

16  everyone.

17       Okay.  All right.  So let's turn to the business at hand,

18  then, this suppression motion, which certainly raises some

19  interesting issues that maybe in some other divisions of our

20  court they've seen these type of arguments, but I don't know.

21  I can't recall on any child pornography case in particular in

22  the Covington division that we've seen some of these type of

23  arguments.

24       So, Counsel, let me -- I do have a number of questions.

25  You might be addressing some of my questions as you go through

1    your presentations for me, but I thought we would just start

2    off with some factual information.  I'd like to just kind of

3    confirm what I think I understand to be the landscape here as

4    far as agreement between the parties of what is not disputed

5    factually.

6         And so my understanding is that the Google situation and

7    the cyber tip or CyberTipline, the report that was made by

8    Google to NCMEC, that all parties are in agreement that

9    neither Google nor NCMEC, at any point with respect to the two

10   images at issue here, opened those actual e-mails -- or excuse

11   me, the attachments to those e-mails.  Is that correct?

12             MR. ECKES:  Yes, Your Honor.

13             THE COURT:  Okay.

14             MS. LEONHARD:  Yes, ma'am.

15             THE COURT:  All right.  All right.

16        And then how about, with respect to Google then -- well,

17   we'll get to that when we talk about your argument, actually.

18   It has to do with how they came across those.

19        All right.  And so then when it was received by NCMEC,

20   NCMEC at that point then, without opening the attachments,

21   forwarded it to the Kentucky State Police?  Is that correct,

22   Ms. Leonhard?

23             MS. LEONHARD:  That's correct.  The Kentucky State

24   Police has the ICAC, the Internet Crimes Against Children task

25   force, here in the State of Kentucky, so they're the point of

1    contact.

2                THE COURT:  Okay.

3                MS. LEONHARD:  The entire report, the PDF and the

4    images, are made available to KSP via a VPN, or virtual

5    private network.

6                THE COURT:  Okay.  And is it also undisputed that the

7    State Police also did not open these attachments before they

8    were forwarded to the detective?

9                MS. LEONHARD:  Your Honor, I don't think that's a

10   question that I've ever asked.  I know that KSP accessed the

11   report and the images, and what Detective Schihl advises me is

12   that he then received a DVD in the mail via certified mail

13   that he accessed.

14               THE COURT:  So it's not received online?  It's

15   actually a physical mailing that is done by NCMEC?

16               MS. LEONHARD:  No, actually it is online from NCMEC

17   to the ICAC point of contact, which, in this case, is KSP.

18               THE COURT:  Okay.

19               MS. LEONHARD:  KSP accesses the report and the images

20   and then puts it on a disk that it mails via certified mail to

21   the local agency that would be responsible for investigating;

22   in this case, the Kentucky -- or excuse me, the Kenton County

23   Police Department.

24               THE COURT:  Okay.  And did they -- they were the ones

25   then -- KSP forwarded it to the Independence Police

1    Department, correct?

2            MS. LEONHARD:  Kenton County Police Department.

3            THE COURT:  Excuse me, Kenton County.

4        And then did you have attached to your response, as far

5    as that transmittal, when it's sent to Kenton County by the

6    State Police, is there a transmittal that goes with that?

7        What I'm getting to here -- and it may or may not even be

8    important, but I didn't realize that -- I thought it would

9    just be a given that KSP did not access these.  But the NCMEC

10   report, for example, that was sent out, it expressly indicated

11   on that that they had not viewed the images.  And so I'm

12   wondering if there was any type of transmittal from the State

13   Police to the local law enforcement as far as whether they

14   viewed them or not?

15           MS. LEONHARD:  Not that I'm aware of.  I can ask

16   Detective Schihl or somebody from KSP that question.

17           THE COURT:  And you've not spoken about that with

18   Detective Schihl?

19           MS. LEONHARD:  I have not.

20           THE COURT:  Okay.  Okay.

21           MS. LEONHARD:  And frankly, whether KSP was the

22   first -- someone from KSP was the first one to look at the

23   images or Detective Schihl is, it's probably irrelevant in

24   that they're both law enforcement.

25           THE COURT:  Right.  Right.  Okay.  But if there was

1   any type of transmittal that accompanied that from KSP to

2   Detective Schihl, could that be -- could that be important?

3   For example, if it indicated one way or the other that they

4   had not viewed them or --

5          MS. LEONHARD:  Not from the United States'

6   perspective, no.

7          THE COURT:  Okay.

8          MS. LEONHARD:  I don't think that would be important.

9          THE COURT:  All right.  Mr. Eckes?

10          MR. ECKES:  Actually, Judge, I don't know that it

11   would be consequential because KSP and Detective Schihl, in my

12   mind, are one and the same in the sense of they're Kentucky

13   law enforcement.  If they opened them up and said something to

14   Detective Shield -- or Detective Schihl -- I think that's

15   probably the same as if he had just opened them himself.  I

16   suspect that didn't happen.  I mean, the way that discovery

17   reads, it seems like --

18          THE COURT:  Right.

19          MR. ECKES:  -- they were a -- KSP would have simply

20   forwarded this information to the correct investigative unit,

21   and Detective Schihl would have then received the report and

22   opened these files.

23          THE COURT:  Right.  It's not so much that scenario,

24   Mr. Eckes.  I think I was thinking about the opposite

25   scenario.  If, for example -- and, of course, I'm just

1    speculating.  But if KSP were to have sent it but with a cover

2    transmittal that indicated, for whatever reason, the

3    attachments were not accessed by KSP and perhaps if they had

4    had a reason indicated in there, does that in any way have a

5    bearing on some of these other -- I don't want to say more

6    subtle because they're important arguments, but arguments that

7    you all are presenting with respect to expectation of privacy,

8    good faith, that type of thing?

9         MR. ECKES:  I mean, I suppose it could be relevant if

10   KSP had put a note on it to Detective Schihl that there's case

11   law that says don't open these until you get a warrant, heads

12   up, and he did it anyway.

13        THE COURT:  The likelihood of that is slim; is that

14   what you're telling me?

15        MR. ECKES:  I suspect so, yes.

16        THE COURT:  Okay.  All right.

17     All right.  Well, see, we're five minutes into our

18   discussion here, and I don't mean to get us down rabbit holes,

19   but I would like to -- as I say, I would like to kind of

20   confirm some of the basic facts.  So that is -- it is helpful.

21     So it came in to KSP, and then they directed it

22   subsequently to the Kenton County Police Department; and it

23   was, of course, accessed by Detective Schihl.  And we have

24   that information in the file as well.

25        And then he, at least according to the progression, as I

1    understand it -- and it's set forth in your-all's briefing --

2    he then would have been the first law enforcement individual

3    who actually accessed -- and when I say accessed, opened these

4    two attachments.

5        Is that correct, Ms. Leonhard?

6            MS. LEONHARD:  It is.

7            THE COURT:  Okay.  All right.  All right.

8        So why don't we -- I think, as I say, I have a number of

9    things that I may need to ask you about depending upon the

10   presentations.  I think maybe the thing to do is just let you

11   argue your motion.

12       So Mr. Eckes, you made the motion.  Why don't you go

13   ahead and start, sir, and I'll try to refrain from

14   interrupting you too much.

15           MR. ECKES:  Thank you, Your Honor.

16       With respect to the initial argument regarding Google's

17   role in this and Google's search, I presented this as

18   having -- as there having been two searches, one by Google.

19   And the way that that operates appears to be a modern form of

20   searching where you have these hash values that Google has,

21   and they look through the contents of any user or subscriber's

22   e-mail and tries to match hash values to potential -- or to

23   uploaded content, wherever that may be uploaded.  So my

24   argument is that's a search and that Google is a state actor.

25       Now, I realize there are cases cited by the United States

14

1    and it's not been that Google has been declared a state actor

2    to date.  But we live in interesting times, and they keep

3    getting themselves closer and closer to being a government

4    agent.

5         So what I'm arguing specifically, which I don't believe

6    has been argued, or at least I didn't find in the cases, is

7    that NCMEC is a state actor, first and foremost.  So step one

8    in this analysis is that NCMEC is a state actor.  And as

9    opposed to going through that whole argument, there's a whole

10   case on that specific issue by now Justice Gorsuch.  So I

11   would point to that.

12             THE COURT:  Okay.

13             MR. ECKES:  It's the public function test.  There's

14   three tests.  There's public function, there's nexus, and

15   there's state compulsion.  And by the public function test,

16   that NCMEC is a state actor.

17        Then what I'm arguing is that Google has intertwined

18   itself then with NCMEC as a state actor.  Google starts their

19   affidavit where it's very clear in their affidavit that we

20   never forwarded these images to law enforcement.  The problem

21   is that they did, because NCMEC has been declared to be law

22   enforcement by --

23             THE COURT:  Okay.  Let me interrupt you there,

24   though.  I believe I heard you say a few minutes ago that when

25   you were addressing Google directly being viewed as a state

1   actor, that there has not been any authority to date that has

2   actually made such a finding.  You agree with that?

3           MR. ECKES:  I agree with that.

4           THE COURT:  Okay.

5           MR. ECKES:  I don't think I found -- I didn't find a

6   case that found Google, in this context, to be a state actor.

7           THE COURT:  Okay.  All right.  Has your research

8   located a case where, under this nexus relationship, Google

9   has been viewed as a state actor?

10          MR. ECKES:  No, but I've also not found the argument

11  made --

12          THE COURT:  Okay.

13          MR. ECKES:  -- that Google has found themselves in a

14  current -- has currently found themselves, at this stage, in a

15  nexus relationship with NCMEC.  And the reason for that,

16  Judge -- and I probably should have made it more clear because

17  I put several articles and public statements by Google in a

18  footnote.

19          THE COURT:  I've looked at those.

20          MR. ECKES:  So, you know, Google has this official

21  blog.  And that's their way of speaking.  It's more of a press

22  release.  And the language is, you know, we're excited about

23  the promise of, quote, collaborating with NCMEC.

24      So what I'm arguing is this is collaboration.  This is

25  what they say it is.  And in their next press release that I

cite, or put in the brief, you have a statement where they say

that, "We need to sustain and encourage orderless

communication between organizations."  What does "orderless"

mean besides we don't have orders when you communicate?

They're -- they're intertwining, Your Honor.

     Then we have an article reporting that NCMEC is

announcing to the world and thanking Google for having

created -- or used their software to create the CyberTipline.

So Google has now -- I want to be specific.  And they say,

"said to date" -- "NCMEC said to date the CyberTipline

reporting form used by the public has been redesigned with the

help of global technology leader Google."  So this is

distinguishing Google from AOL and all these other ones

because now we have Google is very much entwined with NCMEC in

helping them create this CyberTipline.

          THE COURT:  Well, let me ask you this, though.  And I

appreciate that, and I've read your attachments as well.  But

at the end of the day, Google also has -- they've been pretty

forthcoming in their mission statement as well with respect to

their own interests in making sure that not just the United

States, but internationally is rid of this child pornography

epidemic that we seem to, you know, have going on here

unfortunately with the Internet and so forth, to the point

where they are engaging in, you know, international activities

and so forth.

1          But when it comes to the nexus relationship, is there

2     really anything, though, that is in all of this publicity that

3     would seem to suggest that Google has -- that it actually has

4     any type of duty, other than its own voluntary duty -- and

5     it's not a duty.  Its own voluntary efforts, I should say --

6     to collaborate with NCMEC or to do anything else to set up the

7     hash value process, that processing system?  But all of that

8     is done voluntarily by Google.  They don't have any particular

9     legal duty or obligation to do any of this, do they?

10          MR. ECKES:  They do have the obligation to preserve

11     the files.

12          THE COURT:  And to provide the notice --

13          MR. ECKES:  Right.

14          THE COURT:  -- to NCMEC.  But that is when they

15     encounter it, correct?

16          MR. ECKES:  Right.

17          THE COURT:  Right.  So all of this other stuff that

18     they're doing -- the money they're spending, the efforts

19     they're engaging in, but all of that is still voluntary on

20     their part, correct?

21          MR. ECKES:  Right, which is why I'm not arguing the

22     state compulsion.  I'm arguing nexus; that what they're doing

23     is becoming a willful participant in a law enforcement goal of

24     NCMEC.

25          THE COURT:  Okay.

1          MR. ECKES:  That they're intertwining themselves.

2     While the affidavits in this case suggest that the hash values

3     in this case were not provided by NCMEC, originally I thought

4     that to be the case, but that's been corrected through the

5     affidavits.  The affidavits also admit that they do exchange

6     hash values.  So they are, through their, quote, orderless

7     communication, they are intertwining in this goal.  And I do

8     think that while Google has articulated and it makes some

9     sense that they have a business interest in this

10    collaboration -- that's why they make these press releases, to

11    say to the public, hey, look what we're doing.  The problem

12    is, is that this is only going to become a bigger and bigger

13    issue as these private companies that have the ability to know

14    everything about citizens start to work and collaborate with

15    entities like NCMEC that has now been declared, at least by

16    the Tenth Circuit, as a state actor.  So -- and they're

17    collaborating in a way, as we go forward, that who knows where

18    this will lead.

19         So while it's -- the cases have been -- you know,

20    Google's not, I get it, a state actor, is not doing this with

21    the police.  I think the publicity that both organizations are

22    now promoting are running into the Fourth Amendment, and

23    they're doing it with their own statements.

24          THE COURT:  Okay.  All right.

25         Well, it seems to me, to some extent, isn't that

1    addressed by the whole expectation of privacy?  And what I

2    mean by that is the individual, you know, account holders and

3    users of any of these corporations that are now engaging in

4    these types of activities, when you're looking at the nexus

5    relationship, is that counterbalanced by what the law has been

6    looking at as far as technology and the expectations of

7    privacy of citizens within that technology, regardless of

8    whether it's a company, an ESP, or an ISP?

9            MR. ECKES:  I'm sorry.  I don't understand the

10   question.

11           THE COURT:  Well, does that not counterbalance, to

12   some extent, that nexus relationship that you're arguing

13   about?  You're saying the nexus relationship with these huge

14   companies that are going further and further in gathering data

15   about individuals and providing it, theoretically, to law

16   enforcement -- a reporting type of big brother situation --

17   essentially is leading us to of the conclusion, almost the

18   inevitable conclusion, that there should be a nexus

19   relationship found.

20      But the flip side to that, to some extent, I guess what

21   I'm looking at or questioning is the idea that these are, in

22   fact, private corporations still; and they do, in fact, not

23   only have their own agreements for their clientele, so to

24   speak, but also the case law itself is, to some extent,

25   putting checks on the idea of them being big brother and

1    furthering that nexus relationship by the fact that we are now

2    forming expectations of privacy in certain technology.

3         Doesn't that, to some extent, sort of undercut that big

4    brother idea that it's inevitable that it's going to be a

5    nexus relationship?

6              MR. ECKES:  I don't believe that the big brother

7    argument is why -- is what makes it inevitably a nexus.  The

8    nexus in this case is the actions of both these companies and

9    the collaboration.  They're making that choice to collaborate

10   in this way.  When Google's doing their software for them,

11   they're providing Google with hash values, and they're

12   releasing press conferences and giving each other awards back

13   and forth and making it very clear to the public.  They're

14   creating that nexus.

15        The big brother aspect of it is more so of where this

16   ultimately could lead us.  These companies become so connected

17   and intermingled with law enforcement agencies, with state

18   actors, that that gets very dangerous.  The case law is

19   hooking onto this language of Google having its own interest

20   in searching for these things, but in the face of that case

21   law, what Google and NCMEC have decided to do is to become far

22   more connected to each other.  And that's going to cause a

23   Fourth Amendment problem going forward if private companies

24   start doing this type of sharing and collaboration because

25   they're searching private citizens.

1      And I don't think that, you know, that the fact that

2  they're -- the fact that people, I mean, need to use them to

3  get by in life is problematic if that company is then going to

4  go connect itself with a state actor.

5           THE COURT:  Okay.  All right.

6      All right.  So I do understand your argument on that

7  point, but let's move on and say that the courts -- if the

8  Court were to recommend to Judge Thapar that there's not been

9  a sufficient nexus relationship that's been shown here and

10  that we are looking at Google strictly as a private

11  corporation and not a state actor, where do we go from here

12  then?

13           MR. ECKES:  So, Your Honor, assuming, arguendo, as

14  the Court stated, that Google is a private searcher, then this

15  private search by Google essentially is this hash value

16  search.  And then we have another search, a secondary search,

17  that is the opening of the two attachments.

18      Now, I submit, in a very basic way, there was no private

19  search of these e-mail attachments.  So the private search

20  doctrine, while I understand we're going to talk about it, is

21  inapplicable, because what's happened here is that two

22  containers, two virtual containers, e-mail attachments, were

23  searched.

24      So when you think of -- I think there's a threshold

25  question that took me a while to get to, and I didn't even

1    realize I probably, through the whole opening, briefed this,

2    Your Honor.  There has to be a threshold question of what is

3    the container.  And there can be layers of containers in any

4    type of *Jacobsen* question.

5          THE COURT:  Okay.

6          MR. ECKES:  Certainly in this technology, we've got

7    to get apart the layers of the containers.

8        So if you look at *Jacobsen*, an example of what *Jacobsen*

9    would be, clearly, would be if those attachments had been

10   previously opened by Google and Google explained what they had

11   seen and then provided them to law enforcement, that's a

12   clear-cut *Jacobsen*.  I get that.

13       So they don't have that, the United States, the

14   government.  They have attachments that were never opened.  So

15   the response is, but we know the content.  We think -- we're

16   pretty good with our technology.  We know the contents of what

17   is inside of those containers.

18         THE COURT:  Okay.  Let me back up just a minute and

19   make sure.  You said there were two private searches, though,

20   that were done by Google.  So you're talking -- you're

21   referring there to the search of his e-mail account?  Is that

22   what we're first referring to?

23         MR. ECKES:  Yes.  That was of the Google.  That's

24   what Google's role in this was, search and --

25         THE COURT:  Via the hashtag?

```
1              MR. ECKES:  The container was its entirety.

2              THE COURT:  Or not hashtag.  Hash value.  I have

3       to --

4              MR. ECKES:  Right.

5              THE COURT:  -- correct myself on that.  I keep saying

6       hashtag.

7          All right.  So you're saying that the private search that

8       was conducted by Google was not of the pictures or the

9       attachment themselves, but it was of the e-mail account --

10             MR. ECKES:  Um-hmm.

11             THE COURT:  -- of Mr. Miller?

12             MR. ECKES:  Yes, Your Honor.

13             THE COURT:  Okay.  All right.

14             MR. ECKES:  So that then the search by the government

15      is of the two attachments.

16             THE COURT:  All right.  So I interrupted you.  You

17      were talking about the container and Jacobsen and using the

18      container analogy for purposes of how to go about looking at

19      this.

20             MR. ECKES:  Um-hmm.  Your Honor, may I approach

21      briefly?

22             THE COURT:  You may.

23             MR. ECKES:  Actually, I'm just going to tell you from

24      here.  I'm having a vertigo attack pretty bad.  If I could

25      have a moment.
```

1          THE COURT:  Have a seat, please.  Sure.

2          (Recess from 2:35 p.m. to 2:47 p.m.)

3          MS. LEONHARD:  Your Honor, I'm wide open Wednesday

4     afternoon, thinking around the same time, maybe 2:00.  And I'm

5     here Thursday for the arraignment docket.  I think I've got at

6     least three or four defendants who are going to be arraigned

7     at 1:00.

8          THE COURT:  Okay.

9          MS. LEONHARD:  They're all coming in on writs so I

10    would anticipate relatively short arraignments.

11         THE COURT:  Let's see what I've got.  All right.

12    Thursday might be problematic, but Wednesday does look fine.

13    So if Mr. Eckes is available on Wednesday afternoon around

14    this same time, we'll go ahead and reschedule for Wednesday,

15    the 19th.

16         Is he okay?  All right.  That's fine.

17         And then, Madam Clerk, let's go ahead and put that on the

18    record.  Let me just make a brief record.

19         THE CLERK:  Okay.  You're on the record.

20         THE COURT:  Okay.  That's great.

21         All right.  So we took a brief recess in our oral

22    argument proceedings scheduled for this afternoon.  Defense

23    counsel, Mr. Eckes, did have a request of the Court due to a

24    medical situation that unfortunately had its onset in the

25    course of the oral argument here this afternoon.  We did take

1      a short recess.  And without objection from the United States,

2      it is the Court's belief that it would be best for us to go

3      ahead and continue this proceeding so that defense counsel can

4      regain his momentum, so to speak, and deal with the medical

5      situation at hand with respect to the vertigo attack or onset.

6           And so we are looking at the calendar for rescheduling

7      this for Wednesday, April the 19th, at 2:00 in the afternoon.

8      And that is open for the United States.  And then my law clerk

9      has verified with defense counsel that he is available then as

10     well.

11          Mr. Miller, I assume that you would like to be at this

12     continued oral argument proceeding, sir.  You certainly have

13     the right to be here.  And so we will reschedule that for next

14     Wednesday at 2.  As far as any employment and so forth, just

15     want to, of course, make you aware of that in case you need to

16     schedule time off or anything like that.

17          All right.  Let's see here.  I think for purposes of the

18     oral argument itself, then, we'll just recess it in progress,

19     and I'll go ahead and hear from you all next week, and then

20     we'll go from there.

21          Is there anything else, Ms. Leonhard, that you would like

22     to note of record --

23               MS. LEONHARD:  Nothing.

24               THE COURT:  -- for today?

25               MS. LEONHARD:  Nothing.  Thank you.

1          THE COURT:  Okay.  And Mr. Miller, I did cover

2     already with you, sir, the circumstances about your speedy

3     trial rights and so forth.  So you do know while the motion is

4     pending and until we conclude the hearing on the motion, which

5     includes oral argument, at that time it will be placed under

6     submission with my chambers for purposes of a ruling.  But all

7     of this time is excluded from your speedy trial clock.

8          Do you have any questions about that?

9          THE DEFENDANT:  No, ma'am.

10          THE COURT:  Okay.  All right.

11          All right.  Very well.  Well, we'll go ahead and conclude

12     court for today, then, and make sure Mr. Eckes is okay.  Thank

13     you.

14          (Proceedings adjourned at 2:50 p.m.)

15                              -  -  -

16                  C E R T I F I C A T E

17          I, JOAN LAMPKE AVERDICK, RDR, CRR, certify that
      the foregoing is a correct transcript from the audio recording
18     of proceedings in the above-entitled case.

19      \s\ Joan Lampke Averdick              July 25, 2018
      JOAN LAMPKE AVERDICK, RDR, CRR         Date of Certification
20     Official Court Reporter

21

22

23

24

25