1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF KENTUCKY
2         NORTHERN DIVISION AT COVINGTON
                    - - -
3
   UNITED STATES OF AMERICA,      :   Docket No. 16-CR-47
4                                 :
                 Plaintiff,       :   Covington, Kentucky
5                                 :   Wednesday, April 19, 2017
           versus                 :   2:06 p.m.
6                                 :
   WILLIAM J. MILLER,             :       **VOLUME II**
7                                 :
                 Defendant.       :
8
                    - - -
9
           TRANSCRIPT OF MOTION HEARING
10      BEFORE MAGISTRATE JUDGE CANDACE J. SMITH

11                  - - -

12   APPEARANCES:

13   For the United States:     ELAINE K. LEONHARD, ESQ.
                                U.S. Attorney's Office
14                              207 Grandview Drive
                                Suite 400
15                              Ft. Mitchell, KY 41017-2762

16
   For the Defendant:          ERIC G. ECKES, ESQ.
17                              455 Delta Avenue
                                Suite 105
18                              Cincinnati, OH 45226

19
   Transcribed By:             JOAN LAMPKE AVERDICK, RDR, CRR
20                              Official Court Reporter
                                35 W. Fifth Street
21                              Covington, KY 41011

22

23

24
        Proceedings recorded by electronic recording, transcribed
25   via computer.

2

1          (Proceedings commenced at 2:06 p.m.)

2              THE COURT:  Well, good afternoon, everyone.

3       Mr. Eckes, it's good to see you back.

4              MR. ECKES:  Thank you, Your Honor.

5              THE COURT:  Hope you are feeling better.

6              MR. ECKES:  I'm doing my best, Your Honor.

7              THE COURT:  Good.  Good.

8       All right.  Madam Clerk, if you would, please, you can go

9       ahead and call the matter set for oral argument.

10             DEPUTY CLERK:  Covington criminal 16-47, United

11      States versus William J. Miller.

12             THE COURT:  All right.  Let's go ahead for the

13      record, then, and have entry of appearances of counsel,

14      please.

15             MS. LEONHARD:  Elaine Leonhard on behalf of the

16      United States.

17             THE COURT:  Thank you.

18             MR. ECKES:  Eric Eckes on behalf of Mr. Miller, who

19      appears today.

20             THE COURT:  Okay.  And the Court does recognize

21      Mr. Miller here as well.

22       All right.  So, Counsel, I think we've left off last

23      time, Mr. Eckes, you had presented with respect to the

24      government actor argument and, as I recall, were embarking on

25      a discussion of the defendant's view, sort of theme of this

1    particular motion, and the virtual container situation.

2         MR. ECKES:  Yes, Your Honor.

3         THE COURT:  So if you'd like to pick from there, that

4    would be fine.

5         One thing I would ask, Counsel, if you don't mind, just

6    for other reasons of late, I've been listening to a lot of

7    audio recordings, and I'm mindful that the Court comes through

8    loud and clear, but I sit up here at the bench and the

9    microphone is right here.  And actually, I do sometimes have

10   trouble hearing the litigants.  So it's a little bit unusual,

11   but my preference would be that you either remain seated at

12   the table to present your argument, or if you would like to

13   stand, I know some folks like to -- actually like to stand and

14   move about a bit.  If you'd like to use the podium then,

15   because that way the microphone is closer to you.  I just want

16   to make sure we get an accurate recording.  So that would be

17   great.  Whatever you're comfortable with, Mr. Eckes.

18        MR. ECKES:  I'm going to use the podium, Your Honor,

19   if that's okay.

20        THE COURT:  Sure.  Sure.  That's fine.

21        MR. ECKES:  Is that on?

22        THE COURT:  Is it working?  Easier than I realized.

23   All right.

24        MR. ECKES:  That's nice.  I have to remember that for

25   trial.

4

1          THE COURT:  All right.

2          MR. ECKES:  So, yes, Your Honor, what I had started

3     to talk about was the idea of a container and layers of

4     containers and the fact that an e-mail and an attachment would

5     be a virtual container.  And as I see it, an e-mail would be

6     sort of like a letter that's sent -- not sort of.  It's quite

7     a bit like a letter sent in the mail.  An attachment would be

8     something that is another container within that container, in

9     terms of layers of containers, because of the nature of an

10    attachment in an e-mail is a file.

11          So I think the crux of this case really comes down to the

12    nature of an e-mail attachment, and my position is that it's a

13    virtual container.  I think in a lot of these cases, that's a

14    given.  But it becomes very important in this case.

15          Judge Gorsuch talks about, you know, that these are

16    containers.  So with it as a container, the argument follows

17    that it's not like *Jacobsen* because *Jacobsen* would be a

18    situation whereby that container, that specific container, had

19    been opened previously, looked at by a private party, and then

20    re-examined by the government.

21          What we have is a virtual container that is seized by the

22    private party, forwarded to the government via NCMEC, and then

23    the government opens an unsealed container.  So I used my

24    different language because different cases use it differently,

25    but unsealed, uncompromised, but the crux of the matter is it

5

1    was unopened.  And so that, with an unopened container, you

2    have a clear analog in the *Walter* case.

3        Now, before I get to that, the United States is arguing

4    that as -- because of this hash value technology, that they

5    know the contents of this container because they've previously

6    looked at a similar container that has the identical contents

7    of this container.

8        So you have the way they create the hash value, as I

9    understand it, is theoretically, though we don't know who or

10   when, theoretically, a person at Google would have looked and

11   saw what they believed to be child pornography and marked it

12   with a hash value, which then correlates to the search that

13   Google does to find this attachment.

14       Now, my position -- and I think it does make a lot of

15   sense -- that these are two separate containers; that you can

16   have a box and know what's going to be in the line of boxes

17   after it, and you can look in this box and see what's in it,

18   and then you can slap a label on it that says what's in the

19   box, and then you can go down the line and slap a label on

20   every single box that has known to you those identical

21   contents, but you didn't open those other boxes.  You slapped

22   a label on them.  And you've got information, perhaps good

23   information, about the contents of what's in the box, but

24   you've not opened it.  So the private search doctrine doesn't

25   apply here.

1          So to say that the prior opening of a different container

2     that helped you learn the contents of a future container is

3     the equivalent of *Jacobsen* would be stretching *Jacobsen*

4     farther than it's stretched before.  And in the face of that

5     stretching, we've got *Walter*.

6          And *Walter* shows us that if a container comes to you and

7     has the nature of what's inside of it listed on the outside --

8     the *Walter* case is not about how detailed the label is.  It

9     seems to take for granted that there's a label on the outside

10    of a movie that tells you what the movie is and tells you --

11    tells the government that it's likely illegal because of back

12    in the day of more obscenity prosecutions.  And the United

13    States Supreme Court says you still need to get a warrant,

14    regardless of that label.

15         So this dichotomy between *Walter* and *Jacobsen* has been

16    analyzed previously in a district court, which is the *Keith*

17    case.  The *Keith* case basically is in line with the -- I mean,

18    it essentially completely is in line with the argument I've

19    made of an attachment being a virtual container that's not --

20    that this is different than *Jacobsen* because it's a different

21    search.

22              THE COURT:  But, of course, the key distinction with

23    the *Keith* case being that it is from another district court

24    and is persuasive, as opposed to the Sixth Circuit authorities

25    and so forth --

1          MR. ECKES:  No doubt.

2          THE COURT:  -- that you rely on.

3          MR. ECKES:  No doubt.  It's a persuasive authority on

4     this specific *Jacobsen-Walter* dichotomy.  No doubt.

5          THE COURT:  Um-hmm.

6          MR. ECKES:  So then we get to what I find quite

7     confusing, as I kept looking at this and trying to piece it

8     out in my head, is this virtual certainty test.  And

9     ultimately, what I realized is that's on point for when you

10    are opening up -- when a box has been opened, when the

11    container's been opened.

12       So when you have a binder and it's been opened, that --

13    the container is the binder.  The binder's been opened.  And

14    then you take it and you show it to the police, and you've

15    already opened up that binder.  It's an opened container.  So

16    the question can then become is there a virtual certainty that

17    you've -- that it's been opened and already seen.

18       In *Lichtenberger*, you've got a computer.  The container

19    is the computer.  One of the containers.  So you've got a

20    container of a computer.  They look in the -- the private

21    party looks in the computer.  And then the government comes

22    along and looks in the computer.  And the Court's not sure

23    whether or not everything that the private party looked at,

24    the government may have basically looked at more containers in

25    the computer that had been unopened.  And because there was no

1    virtual certainty that none of those file containers had been

2    opened and they may have opened up new files, the

3    *Lichtenberger* court suppressed it.  So --

4         THE COURT:  So is it a virtual certainty as to the

5    opening or not of the container?

6         MR. ECKES:  Of finding -- it's a virtual certainty of

7    whether or not the government -- is it a virtual certainty of

8    whether or not the government has seen the same thing as the

9    private party did of an unsealed box.

10        THE COURT:  All right.  So -- so let me ask you this,

11   then:  Following up with that consideration of what the near

12   certainty or virtual certainty language is all about -- and,

13   of course, that was applied in the context of those specific

14   cases, what they might have involved, photo albums or laptops

15   and whatnot.

16        MR. ECKES:  Um-hmm.

17        THE COURT:  Here we have this hash value situation

18   that, at least from what I'm reading from all the briefings,

19   there doesn't seem to be a dispute that at least as far as how

20   that process comes about, those hash values are assigned

21   within the industry based upon a prior review of the same

22   image, not a review of the image in that particular situation

23   or scenario.

24      So I guess that leads me to -- as I read through those

25   cases, one thought that occurred to me is when we're talking

1    about virtual certainty and near certainty, of course there's

2    the whole discussion about the percentage of accuracy of these

3    hash values and so forth.  But I'm guessing that you would

4    distinguish those based upon no matter what the percentage is,

5    it hasn't actually -- this particular image hasn't been

6    viewed.  Is that correct?

7              MR. ECKES:  That's correct.

8              THE COURT:  Okay.  Okay.

9              MR. ECKES:  Opened.

10             THE COURT:  Opened, yes.  Those hash value process,

11   then, this is done by ESPs, ISPs, as part of their maintenance

12   of their system, so to speak.  And not fully understanding all

13   of the details of that, but could it be viewed -- it seems to

14   me that when we're talking about viewing and opening images,

15   or whatever it is that law enforcement is looking at, all of

16   these authorities have been premised upon basically the human

17   eye and whether a law enforcement individual or person has

18   actually viewed something.  But is there the possibility of

19   viewing the hash value as essentially the digital eye of

20   whatever it is, AOL or Google in this case, that it is

21   literally their digital eye?  And so that image has been

22   viewed by Google, but in the sense of the technology that it

23   has developed, not by the human eye.

24        In other words, is a human eye viewing going to be a

25   requirement, then, of how we go about looking at this near

1    certainty or virtual certainty test and if it falls within the

2    private search doctrine?

3           MR. ECKES:  Judge, I think that's an interesting

4    issue.  And what I'm wondering -- I mean, the problem -- my

5    first thought -- because I have not researched that specific.

6    I mean, I would argue that, again, we would be expanding the

7    Fourth Amendment quite a bit to allow the private party to use

8    a technology that is better than the human eye to have looked

9    inside of something.  Because what I'm thinking of is the

10   *Heath* case, and the government can't look into a house with

11   the heat monitor -- so, you know, that's a whole 'nother

12   search, essentially, that the Court is positing --

13           THE COURT:  By a private party.

14           MR. ECKES:  A computer search.

15           THE COURT:  By a private party.  Right?

16           MR. ECKES:  At this stage of the argument, yes, by a

17   private party.

18           THE COURT:  And I understand you still have -- you

19   have that issue on the table about Google being a state actor.

20           MR. ECKES:  I mean, so are you arguing it's akin to

21   if we go to a box --

22           THE COURT:  I'm not arguing anything.

23           MR. ECKES:  Correct.  Positing, correct.

24           THE COURT:  I'm just posing that in looking at all of

25   this, it does occur to me that everything that we're talking

1   about is human eye viewing.

2          MR. ECKES:  Right.

3          THE COURT:  And we're in the age of technology.  So

4   is there some space for the idea, as society evolves

5   technologically, that this is technology that is -- it is

6   owned by a large multi-national corporation; but nonetheless,

7   if the Court were to find that they are a private party, is

8   that hash value matching, so to speak?  That search that is

9   done by hash value a form of digital eyeing of things?

10          MR. ECKES:  What if a private party has a technology

11   to look in your house from an airplane as they fly over it

12   because they have x-ray -- they develop x-ray technology?

13          THE COURT:  A drone.  What about a drone?

14          MR. ECKES:  Or a drone.

15          THE COURT:  That's a trespass, right?

16          MR. ECKES:  Right.

17          THE COURT:  So if a drone that's owned by a private

18   party were to fly over someone's backyard that's fenced in and

19   see illegal activity occurring, but it's seen through the

20   camera eye of the drone, not by the human eye actually

21   visualizing it, is it still permissible that they could turn

22   that information in to law enforcement and law enforcement

23   could then, I guess, arrive on the scene or conduct whatever

24   they needed to?  Of course, this is all about warrantless

25   activity.

12

1        MR. ECKES:  Um-hmm.  I mean, I think that's

2   problematic where that could lead if a private party is able

3   to conduct -- to open up containers -- to look inside

4   containers through some sort of technology and then turn that

5   over to law enforcement, I think that's a huge expansion of

6   the private search doctrine.

7        What the private search doctrine is really about is, you

8   know, this idea that you're making -- if a private party has

9   invaded you already, then the government hasn't -- you know,

10  they haven't expanded on the invasion that a private party

11  did.

12       But using technology to look inside of containers that

13  belong to you, I don't think *Jacobsen* allows for that.  I do

14  agree that the virtual certainty test probably comes into play

15  at that point because that's a -- with the way the Court has

16  posited it, you're looking at, you know, the private search

17  being different than I've imagined it so far, the private

18  search being looking inside the attachment via -- and I don't

19  really think that it is, in fact, looking inside that box.  I

20  do think it's more akin to a label than to actually having

21  been inside that box, inside that container, that attachment.

22       THE COURT:  I'm sorry.  I didn't follow you there.

23  When you say it's more akin to a label as opposed to --

24       MR. ECKES:  To -- to -- you've looked -- you look at

25  one container and use the information from that container to

13

1    determine what is in other containers.  I don't think that is

2    akin to still looking inside those other containers.  It's

3    akin to using it to create labels for those containers of what

4    you're pretty sure is in those containers.

5         THE COURT:  Okay.  So -- so bringing us back to

6    basically the visualization, human eye visualization, of that

7    specific container, so to speak --

8         MR. ECKES:  Yes.

9         THE COURT:  -- you think that that is still what is

10   required for purposes of the private search doctrine?

11        MR. ECKES:  I think it has to be unsealed.  I don't

12   think a container -- I don't think *Jacobsen* allows for the

13   government to utilize information from a private party when

14   the container that's been turned over to the government is

15   uncompromised and unsealed.

16        THE COURT:  Okay.  And so then it's a question of how

17   we -- how precedent is going to dictate the parameters of what

18   is considered to be unsealed?

19        MR. ECKES:  Yes.  I mean, I don't think these are

20   unsealed.

21        THE COURT:  Okay.  All right.  I interrupted you.

22   Sorry.  Continue.

23        MR. ECKES:  So yeah.  So ultimately, the virtual

24   certainty language is not relevant for an unsealed container.

25   If it's been compromised, then the virtual certainty test -- I

mean, *Jacobsen* -- there is the box that's opened and they're looking, and then you do a virtual certainty test as to whether they've already exploited everything that the police look at.

There's another case -- I think it's *Richards* -- where you have a storage unit. So we've got layers of containers. The storage unit. Then there's, I think, a suitcase in there. But all those had been opened ultimately. You know, you test for a virtual certainty as to whether or not it's been compromised in that way, but they've all been opened. So when they look inside the suitcase or they look inside the storage container, the private party had opened those up.

So ultimately, you've got an exceeding of the scope of the Google search because the Google search is just the overall hash value search of picking out the file. I understand the Court has thrown a wrinkle into the middle of that. But then there's the private search, which is opening unopened containers. And that law is pretty well -- is settled. You can't open an unopened container without a warrant, regardless of what label's on it.

Speaking of the trespass theory, you know, it's an area of the law that I suppose is in somewhat flux. But perhaps not. So I believe all the opinions from the Supreme Court on the trespass theory were from Justice Scalia, but Justice Gorsuch is very much in line with those things, and we have

1    his opinion on the trespass theory and e-mails in the *Ackerman*

2    case.

3        And what is posited is that whether this is viewed

4    through the lens of *Katz*, ala *Jacobsen/Walter* analysis that we

5    just did, or you view it through the trespass doctrine, the

6    government has an issue because the trespass that chattels,

7    the way that that was commonly seen, would have been this type

8    of thing; taking, opening a container that was sent through

9    the mail that was within another container, opening it up to

10   obtain information.  And that's what the government did.  They

11   trespassed to chattels.  It's a container that was taken,

12   regardless of whether it's by a private party, and then it's

13   invaded by the government.  And the trespass doctrine doesn't

14   just limit itself to your home.

15        THE COURT:  So how do you reconcile that with --

16   you'll know it off the top of your head -- the cocaine case.

17        MR. ECKES:  *Jacobsen*.

18        THE COURT:  Yes.  So with *Jacobsen*, it is opened

19   though, but didn't law enforcement go beyond that then?

20        MR. ECKES:  Well, Justice Gorsuch says it's time to

21   overrule *Jacobsen*, or he says perhaps that's what will happen.

22        THE COURT:  He does.  He does.

23        MR. ECKES:  Because *Jones* is post-*Jacobsen*.  I think

24   you do -- I don't think you ultimately have to overrule all of

25   the private search doctrine law.  I don't know that that has

1   to be the sweeping decision of this Court.  But looking

2   specifically into an unopened container as a trespass to

3   chattels would be a violation of the trespass doctrine.

4   Again, getting -- focusing in on the unopened container.

5            THE COURT:  Okay.

6            MR. ECKES:  In terms of a reasonable expectation of

7   privacy, I think -- I mean, *Warshak* has been cited throughout

8   the country, after the Sixth Circuit decided *Warshak,* as a

9   seminal e-mail case.  And, you know, the *Warshak* case spends

10  pages discussing terms of subscriber agreements.

11           THE COURT:  Um-hmm.

12           MR. ECKES:  And finds that there's a -- while not

13  making any sweeping standards, it seems to suggest that

14  there's a pretty high hurdle of what would need to be in a

15  subscriber agreement for you to waive your reasonable

16  expectation of privacy with how integral to your life e-mail

17  has become.

18           THE COURT:  Monitoring your contents?

19           MR. ECKES:  Yes.

20           THE COURT:  Isn't that what the Google agreement said

21  here; that they reserve the right to monitor the contents?

22           MR. ECKES:  No.  The Google agreement says -- the

23  main two parts -- and this would be page ID 164 from the

24  government's motion --

25           THE COURT:  Okay.

1    MR. ECKES:  -- "We have our services display some

2    content that is not Google's.  This content is the sole

3    responsibility of the entity that makes it available.  We may

4    review content to determine whether it is illegal or violates

5    our policies, and we may remove or refuse to display content

6    that we reasonably believe violates our policies or law.  But

7    this does not necessarily mean that we review content so

8    please don't assume that we do."

9    Judge, this is in -- the way to read this paragraph --

10   and I understand that it's been selectively quoted by the

11   United States -- is Google's covering itself in case -- for

12   intentional infliction of emotional distress in case somebody

13   sees something on any of their platforms that a third party

14   put up there.  They're saying, we might have reviewed it; we

15   might not, but that's on them.  That's on the person that put

16   it up there.

17   So then we get to what your content, which is on the next

18   page, where they say, "You retain ownership of any

19   intellectual property rights that you hold in content.  In

20   short, what belongs to you stays yours."

21   And then later, when you upload -- when it talks about

22   uploading or receiving content through the services --

23   THE COURT:  What about under Your Content there, it

24   says, "Our automated systems analyze your content, including

25   e-mails," right?

1        MR. ECKES:  Right, "to provide you personally

2    relevant product features, such as search results, tailored

3    advertising, and spam and malware detection."

4        THE COURT:  So you're saying that it's just for

5    business purposes and that it wouldn't be appropriate for a

6    court to use in para materia to then say this relates back to

7    they also reviewed to make sure no illegal activity is

8    occurring?

9        MR. ECKES:  Right.  Because what this is specifically

10   tailoring their review to what we know they do it for -- and

11   everyone's always known they do it for -- is advertising

12   they're going to give you.  They say it's for our benefit, but

13   it's to advertise to us.  And even up there, the right to

14   agree on this license, the paragraph above, "are for the

15   limited purpose of operating, promoting, or improving our

16   services and develop new ones."

17       It is not telling you, Beware, if you use our content,

18   we're going to potentially forward it to the police.  You're

19   not going to find a user agreement that does because no one

20   would ever use that service again.  But Google certainly

21   doesn't do it.

22       THE COURT:  So you're saying it would be easy enough

23   for them to do that, to identify their monitoring and/or

24   reporting that specifically, but for practical business

25   purposes, they choose not to do that?

1          MR. ECKES:  Right.  And so they tailor it -- they

2     tell you that they're going to look at it specifically for the

3     purpose of making your experience better.  And I believe

4     *Warshak* talks about that, too; that it gets tailored to -- any

5     type of we're searching you or doing this is tailored to that

6     idea.  It's not going to suddenly defeat, then, your

7     reasonable expectation of privacy in the mail.

8          THE COURT:  Okay.

9          MR. ECKES:  Again, Judge, then the United States

10     talks about this hotel analogy, which I had to think about a

11     few times, but I think it again is going to come down to this

12     unopened container, the seizure of an unopened container, that

13     characterization.  Because to agree with that would mean that

14     the private party, the hotel operator, seized a container,

15     provided it to law enforcement, then closed the room down and

16     didn't let the person back in the room.

17     But no one would argue that if the -- I don't think

18     anyone would argue that if the hotel operator went in and took

19     your suitcase and gave it to the police and then shut you out

20     of the room, that the fact they shut you out of the room has

21     anything to do with whether the police can later open up that

22     suitcase without a warrant.

23          THE COURT:  All right.  So the defendant's position

24     is that those cases like *Allen* and *Lanier*, those are just

25     misplaced; they're not even applicable here because of the

1    timing of when the account was closed?

2         MR. ECKES:  Yes, and because of the nature of the

3    different characterizations that the United States has for

4    what occurred and what, you know --

5         THE COURT:  All right.

6         MR. ECKES:  -- I, you know, posit occurred.

7         THE COURT:  Okay.

8         MR. ECKES:  So then we get to the final arguments of

9    good faith and independent source doctrine.

10        Your Honor, in terms of good faith, the -- you know, as I

11   understand the good faith doctrine, generally speaking, you're

12   dealing with someone, a police officer, who is relying on

13   something to conduct a search or to otherwise -- and then

14   later on, someone, some sort of court, finds that the behavior

15   activity of the police was unconstitutional.  But the

16   government says, yeah, but at the time, the officer was

17   relying on this.  I'm not sure what the government is arguing

18   that the detective was relying on because --

19        THE COURT:  So you're saying that -- and I know there

20   isn't a whole lot of briefing on the good faith application

21   here.  So is it your position that the good faith doctrine

22   does not apply in circumstances of a private search?

23        MR. ECKES:  I don't -- not exactly.  The good faith

24   doctrine doesn't apply unless the police officer was relying

25   on a case or law that suggested it was okay to do what they

1    did.

2         THE COURT:  But the inverse cannot be true?

3         MR. ECKES:  How so?

4         THE COURT:  Well, you say unless there was a case

5    that allowed them to do what they did.  But if there were no

6    case specifically --

7         MR. ECKES:  Right.  Get a warrant.  There is no case,

8    you get a warrant.  That is -- that is the ultimate goal for

9    all of this in the technology field, is when there's not a

10   case, get a warrant.  And because technology's so good, that's

11   not going to be so hard.  And everyone recognizes that.  So,

12   yes, get a warrant.

13        And it's not that there's no case.  It's that opening an

14   unopened container, as I quoted, since 1878, that's sent in

15   the mail, you can't open an unopen container.  So, yes, I

16   jumped the gun a little bit there in saying that when it -- I

17   do hope someday the Supreme Court says if there's ambiguous

18   case law in what you're doing, get a warrant.

19        THE COURT:  Well, how about this.  How about this.

20   The government has posed in their briefing -- and in looking

21   through the cyber tip report, that's one of the questions I

22   have for the government.  It's pretty clear NCMEC says in the

23   report, I think in a couple of spots, that it did not open

24   this attachment.  But there isn't really anything in the

25   report, one way or the other, that indicates what Google did

1    or did not do with this.  Correct?

2         MR. ECKES:  I would say the report does say that

3    because it uses --

4         THE COURT:  Does say what?

5         MR. ECKES:  That it says automatic, that the report

6    was automatic, which would seem to suggest that they didn't

7    look at it, that it was automatic.

8         THE COURT:  Well, how so?  I mean, a report can be

9    automatic, but -- the reporting process itself can be

10   automatic.  I'm guessing even when they actually view an

11   image, that's still a report that is generated, right?  Even

12   if it popped up from hash value and someone at Google actually

13   did visualize it with the human eye, they'd still forward the

14   same type of report to the CyberTipline.

15        MR. ECKES:  I think if, with any familiarity with

16   these reports, automatic means that it was not subject to

17   manual review.  But regardless of that, I do not believe that

18   the good faith doctrine extends to an officer misinterpreting

19   how evidence got to him.

20      First of all -- and quite frankly, Judge, we don't

21   have -- the United States could have called him as a witness

22   and put the evidence before that he believed when he did it

23   that Google had opened it, but they did not do that.  But even

24   then, I think -- I don't think the good faith doctrine expands

25   to a factual misunderstanding by the officer.

1          THE COURT:  Well, and I guess that is my question.

2    I'm still wrestling with how the good faith doctrine works in

3    the private search context to begin with, frankly.  I've

4    looked at some authorities beyond, as I said, the briefing --

5    and I understand you all had a lot of issues to deal with

6    here, but the briefing is somewhat limited on good faith.  And

7    it just seems to me that with a private search doctrine and

8    applying the good faith analysis to that as far as what the

9    officers did or did not do, we're often not looking at a

10   circumstance -- or we're often looking at a circumstance where

11   there's no warrant, there is no other type of statute or that

12   sort of thing.  So isn't a lot of that good faith

13   interpretation about what is known or not known about the

14   circumstances of that private search?  And does that come into

15   play in analyzing the application of good faith to the private

16   search context?

17        MR. ECKES:  I think it would be a bit of a stretch to

18   put into the detective's head that he believed Google had

19   opened it and that's why he opened up these files.  Because

20   that evidence is not before the Court, and I would have to

21   research more the idea behind it; that if they had presented

22   that evidence, whether that would be subject to a good faith

23   analysis.

24        I'm having a hard -- I don't know that I've come across

25   cases where, you know, an officer relies on a prior case, an

1    officer relies on a statute, an officer relies on an incorrect

2    implication of the way Google sent him the information in the

3    face of a report that says it was an automatic report.  I

4    don't think the good faith doctrine would extend that far.

5        Do you have other questions on good faith?

6            THE COURT:  Not at the moment.

7            MR. ECKES:  The independent source doctrine, Judge,

8    this warrant is pretty lacking once the paragraph is taken out

9    about looking at the pictures and seeing that they're child

10   pornography.  While the CyberTipline is referenced, there's

11   hardly any way to read that paragraph and squeeze out any type

12   of probable cause related to Mr. Miller.   It is a particular

13   poisonous tree, this search, but I don't see how you can look

14   at that warrant and find, excising the paragraph where

15   Detective Schihl says that he looked at the pictures, probable

16   cause remains.  And then there's a problem for the United

17   States because everything followed from there.

18           THE COURT:  So are you -- is your stance -- I know

19   generally you've indicated the relief you're seeking is to

20   have all of this information suppressed because the warrants

21   themselves flowed like dominos basically.

22           MR. ECKES:  Correct.

23           THE COURT:  So are you advocating, then, that the

24   Court would have to excise what?  From these warrants, or at

25   least from that first warrant, it would have to remove or

1    exclude the description of the images that was offered by the

2    detective?

3        MR. ECKES:  Yes, Your Honor.  And then once that

4    warrant's gone, then everything is found from there.  I mean,

5    everything flows like dominos, as the Court said, all the way

6    through -- it's all a direct result of that initial illegality

7    of looking at these pictures.

8        THE COURT:  Okay.

9        MR. ECKES:  And I've seen -- you know, there has been

10   suppression in these type of cases -- not this issue, but

11   these type of cases -- where the first search of a computer is

12   illegal, and usually everything is gone after that, and the

13   case ultimately gets dismissed if everything is suppressed.

14       THE COURT:  Okay.  Mr. Eckes, I'm wondering about --

15   I want to go back to near certainty, virtual certainty, here

16   for just a moment.  It did occur to me, I had a question for

17   you all about the report indicates the names of the files;

18   that the files, the attachments to the e-mail and the names

19   that were assigned to those images within the e-mail itself,

20   those were provided in the report.

21       MR. ECKES:  That's correct.

22       THE COURT:  Do you think that that has any bearing on

23   the near certainty or virtual certainty consideration?

24       MR. ECKES:  I don't, because I believe that the

25   file -- that the containers were unopened.  So the virtual

26

1    certainty analysis, while it gets confusing because it even

2    uses the word "virtual," is irrelevant because we have

3    unopened boxes.  These file names are ultimately entirely

4    similar to the labels in *Walter*.  They don't even -- you know,

5    I don't even think that those specific file names are as

6    incriminating as the government does.  But be that as it

7    may -- and the government also talks about -- and I'm sure

8    they'll bring up again -- that there's this A1 or B1, I don't

9    remember what, but some sort of --

10            THE COURT:  Categorization.

11            MR. ECKES:  -- categorization.  My position is that's

12   just additional labeling.  That's more label as to what's

13   inside the contents of the container.  But *Walter* tells us

14   that it can be very, very specific what the label is.  You

15   can't look in it till you get a warrant.

16            THE COURT:  All right.

17            MR. ECKES:  Thank you, Judge.

18            THE COURT:  Well, I appreciate your presentation

19   here, and if I think of anything else I need to ask you, we'll

20   address that --

21            MR. ECKES:  Thank you.

22            THE COURT:  -- before we conclude.

23       Ms. Leonhard.

24            MS. LEONHARD:  Thank you.  Your Honor, the

25   defendant's motion should be denied really for three reasons.

27

First, the search by Detective Schihl is inflated by the
private search doctrine.  Second, the defendant had no
reasonable expectation of privacy in these two attachments
that we're talking about.  And finally, the good faith
doctrine does apply to warrantless searches in this case
because Detective Schihl had no reason to believe that what he
was doing was unconstitutional.  That's the test under *Leon*
when it comes to warrantless searches.

     The defendant makes a compelling but I think off-base
analogy that the attachments in this case were unopened
containers.  It misses the mark.  These containers were
opened.  In this case, the appropriate analogy is these
attachments were more like containers that had been x-rayed,
and the x-rays pretty clearly depicted what the contents were
inside.

     It's convenient to ignore the facts about what the
inspection entailed in this case.  But the contents of these
attachments were known.  So that's why all of the discussion
about this is a *Jacobsen* case or a *Walter* or any of those --
any analogy to those sorts of cases is off-mark because here
we do have information.  The contents of the attachments had
been reviewed, first by a human, by an employee at Google.
After that visual inspection, Google hashed the images.

          THE COURT:  Well, you understand his argument,
though, that it was not this image that had been viewed by

28

1    human eyes at Google?

2              MS. LEONHARD:  But to ignore the human inspection and

3    the hashing of the image, then the adding of the hash at the

4    library and then the use of the hashing technology, that's why

5    I say it's convenient to ignore the rest of the facts, but

6    those are the facts.  That's why these are not unopened

7    containers.  They are containers that we know a lot about the

8    contents because somebody had looked at them.

9         Whether it occurred concurrently with what occurred in

10   this case is irrelevant.  The contents were known.  This is

11   not a situation where law enforcement or even a private entity

12   looks at box A and then, as Mr. Eckes suggests, slaps labels

13   on other boxes.

14        In this case, I'm not sure what the defense is arguing

15   that the label is.  Is that it's the hash?  Is it the

16   classification?  Is it the file name?  None of those are

17   really the labels because in this case we know what was in the

18   attachments.  They had been --

19             THE COURT:  Well, Google might.  But as far as this

20   court record though, I mean, I understand we've talked a lot

21   about hash values and so forth, and it's an interesting

22   exercise and learning all kinds of new things here, and

23   obviously the industry uses it heavily.  But in terms of the

24   accuracy, I guess I would put it, in simple terms, does -- you

25   know, does the record really reflect anything about the

29

1    accuracy of how this whole hash value system works?

2              MS. LEONHARD:  I think it does.  I think Google has

3    indicated that it first has to be viewed by a human employee;

4    that Google then hashes the image, it adds it to its library,

5    and then it uses proprietary software to scan any content by

6    any user with which it is contracted.  Uses that proprietary

7    software to scan any material content that is uploaded by one

8    of its users.

9         So I think we know exactly what was in the contents.  And

10   so it's a series, it's a sequence of events, that brought us

11   here to this case and which sort of enlighten everybody about

12   the content of the files.  So that's why the unopened

13   container analogy just is not the right one.  It's a container

14   that has been inspected, that has been, frankly, x-rayed, and

15   that that x-ray reveals pretty good and accurate information

16   about what's inside.

17             THE COURT:  When you say pretty good and accurate

18   information, that's where -- and that may certainly be a point

19   of fact, but I'm just wondering where that is in this record

20   in terms of the test rate, so to speak, of how these hash

21   values do.

22             MS. LEONHARD:  I think that there's --

23             THE COURT:  I know *Ackerman* talks about the

24   reliability of them.

25             MS. LEONHARD:  It does.  And one of the other cases

30

1    that I cited I think talks about the accuracy being in excess

2    of 99.9 percent of the hash value technology.  And I think

3    that case might have been a case involving AOL.

4            THE COURT:  *Cartier*, I think it was.

5            MS. LEONHARD:  One of the ones.

6            THE COURT:  But they used that information to get a

7    warrant in *Cartier*.

8            MS. LEONHARD:  But the issue in this case, what the

9    Court is asking about, is did the private searcher know what

10   was in the contents, and it absolutely did.  So in this case,

11   it's not about -- if the government comes later and searched

12   the same contents without a warrant, the question isn't did

13   law enforcement stay in lockstep with the private searcher.

14       The question under *Lichtenberger* is -- actually,

15   *Lichtenberger* says the critical measures is whether the

16   government -- about whether the government exceeds the scope

17   of a private search that proceeded are how much information

18   the government stands to gain and how certain it is about what

19   it will find.

20       In this case, the government stood to gain no additional

21   information about what was inside those two e-mail

22   attachments, given the facts that were present at the time.

23   Two e-mail attachments.  I think it was --

24           THE COURT:  Well, if you stood to gain no additional

25   information, why not get a warrant then?

1          MS. LEONHARD:  I think because in this case Detective

2     Schihl had a reasonable belief that those images had already

3     been viewed and had been lawfully seized and provided to law

4     enforcement by Google.

5          That's not -- the question is not, under the private

6     search doctrine, why didn't the government get the warrant.

7     Under *Lichtenberger*, it's how much information did the

8     government stand to gain and what was the -- was it a virtual

9     certainty about what it expected to find.  That's the inquiry

10    under *Lichtenberger*.

11         I think why didn't law enforcement get a warrant goes

12    more towards the good faith argument.  And in that case, the

13    question is would a reasonable officer, under the

14    circumstances, have believed that what he was doing was a

15    constitutional violation.

16         THE COURT:  Well, what about *Warshak*?

17         MS. LEONHARD:  *Warshak* is completely inapplicable in

18    this case.  *Warshak*, as a general proposition, said people

19    have a reasonable expectation of privacy in their e-mails.

20    The content of the e-mails was not examined in this case.  In

21    this case, we're talking about --

22         THE COURT:  So -- but not in the attachments to your

23    e-mails?  Isn't that what *Warshak's* saying?

24         MS. LEONHARD:  No.  *Warshak* stands for the general

25    proposition that people have a reasonable expectation of

32

1 privacy in their e-mails.  In that case, it involved a

2 warrantless search of e-mail contents under the Stored

3 Communications Act.

4 *Warshak* is completely distinguishable from this case in

5 which Google seized two attachments; did not review the

6 contents of the e-mail; frankly, told, in the CyberTipline

7 report, NCMEC that it didn't even know whether it knew -- told

8 NCMEC that it didn't know even whether the e-mail had been

9 sent.

10 Two image files containing child pornography, the content

11 of which was described and the content of which was

12 classified, at a time when this defendant violated the terms

13 of service that he agreed to with Google, and that third party

14 terminated the account.  That -- those are the facts and

15 circumstances that show that in this case, this defendant had

16 no reasonable expectation of privacy in those two e-mail

17 attachments.

18 This isn't a situation where they got -- where law

19 enforcement got -- went in and searched limitless e-mails.

20 That's not what we're talking about in this case.  We're

21 talking about two attachments to an e-mail that were

22 attachments to an e-mail, the contents of which were never

23 reviewed, by anyone.

24 THE COURT:  But why would he not -- you lost me a

25 little bit on why would he not have an expectation of privacy

in attachments to an e-mail?  If *Warshak* says that objectively there is an expectation of privacy in your e-mails, and if *Warshak* talks about the ISP and ESP user agreements and the difficulties or the hurdles with those as far as conducting a search of e-mails and so forth pursuant to those agreements, then why wouldn't -- why wouldn't that discussion from *Warshak* be applicable to this circumstance?

MS. LEONHARD:  I think *Warshak* is sort of the overarching umbrella that says people have a general reasonable expectation of privacy in the contents of their e-mails.  But when you get down into the specific facts of this case, you're not talking about e-mail contents.  You're talking about two attachments of child pornography that had explicit file names, the content of which had been described and classified by the ESP who seized them from the defendant's account, as it legitimately had a right to do because it monitored his content.  And actually, the terms of service with Google also indicate that every user -- not only can users not use the platform in violation of law, but it also says the users who send, receive, upload content actually give Google rights in whatever they upload.

So while *Warshak* might, and the idea that people have a general reasonable expectation of privacy in e-mails, while that might be the overarching theme, we are -- this case -- the facts of this case present a bit of a funnel effect in

34

1    that we agree with that.

2         We're not arguing that he had no reasonable expectation

3    of privacy in his e-mails.  We're saying he had zero

4    expectation of privacy, and not one that society is prepared

5    to recognize as reasonable in two attachments, two image

6    files, of child pornography that had these classifications --

7    one classification because they were both classified in the

8    same way -- in explicit file names, at a time when this

9    defendant's g-mail account was disabled concurrently with the

10   time that these attachments were uploaded.  And at a time when

11   the third party with which he contracted exercised its right

12   to terminate his account.

13        There is no universe in which a defendant can argue that

14   he has a reasonable expectation of privacy in those specific

15   factual circumstances.

16        So the private search doctrine, the United States

17   believes, still insulates the search because the contents of

18   the image attachments -- excuse me, the attachment files --

19   they were known.  The contents of these images were known,

20   despite the fact that they had not been opened by Google in

21   this case, at this time.  They had been previously.  So to

22   ignore that fact I think is to just simply pick out the facts

23   that are convenient for the defense's argument.  And so --

24        THE COURT:  So are you saying it doesn't matter --

25   are you saying it doesn't matter if Detective Schihl knew, was

1    aware, whether or not Google had actually -- because he knew

2    that NCMEC had not opened the containers, so to speak.

3         MS. LEONHARD:  Absolutely.  The CyberTipline report

4    states that expressly on its face.  But I think to argue -- I

5    think it's a stretch for anybody in this courtroom to say that

6    the use of the word "automatic" in the CyberTipline report

7    reveals that nobody had looked at it; that it was -- even if

8    it said "automated," which is frankly, I think, probably the

9    more precise word, there is no indication, no reasonable

10   person, and certainly no reasonable law enforcement officer

11   would look at that term "automatic" under the heading in the

12   ESP information and think this means that a live human

13   employee did not look at this, did not look at these images.

14        THE COURT:  Well, does Detective Schihl have an

15   obligation -- in the private search realm, what are the

16   obligations of law enforcement in terms of informing

17   themselves of the scope of the search?

18        MS. LEONHARD:  Under *Lichtenberger*, I don't think

19   that's the appropriate inquiry.  The inquiry isn't on what are

20   the obligations of law enforcement.  The inquiry is the

21   two-step inquiry about what information does the government

22   stand to gain and how certain was it regarding what it was

23   going to find.  The question is not what alternatives or what

24   avenues or what options did the government have to satisfy

25   themselves about or what other obligations --

36

1          THE COURT:  Well, but how can the government know

2     what it stands to gain unless it knows what's already there?

3          MS. LEONHARD:  And in this case, we did.  The

4     government knew what was in the -- what was -- what the

5     content of the attachment files revealed, given the human

6     inspection, the hashing of the images, the use of the

7     proprietary hashing technology, the match using that software

8     to these two images that the defendant uploaded to his e-mail,

9     the fact that the ESP in this case, Google, had looked at

10    the -- not only had looked at the images, but had taken pains

11    to classify them according to industry standards as involving

12    prepubescent minors engaged in a sex act, and given the file

13    names.

14       So this isn't a situation where you have labels slapped

15    on unopened boxes.  It is a situation distinctly different

16    from *Walter* and *Jacobsen* where the Court, based upon -- and

17    frankly, the officer, based upon the facts at hand and

18    memorialized in that CyberTipline report -- had every reason

19    to believe that the images had been looked at and knew what he

20    was going to find.  Those are the inquiries under

21    *Lichtenberger* about whether a search, warrantless search,

22    conducted by law enforcement is insulated by the private

23    search doctrine.

24          THE COURT:  Okay.  So let me wrap this up on one last

25    question, then, as far as the discussion on this point.  So

1   whether or not Detective Schihl knew if these attachments, not

2   the images that they matched with -- I guess I'll put it that

3   way -- but whether or not Detective Schihl knew if these

4   attachments had been opened by Google, is that a relevant

5   consideration here?

6           MS. LEONHARD:  Not in the government's estimation.

7           THE COURT:  Okay.

8           MS. LEONHARD:  Because the contents of the e-mails --

9   based upon the totality of the facts available to Detective

10  Schihl --

11          THE COURT:  Okay.

12          MS. LEONHARD:  -- at the time when he was reviewing

13  the CyberTipline report, he knew that it was virtually certain

14  that looking at those images would depict exactly what they

15  depicted.

16      Your Honor, I know the Court has indicated that perhaps

17  the parties gave the good faith argument a little bit of short

18  shrift in the briefing, but *Leon* and the cases interpreting

19  *Leon* have held, and even the cases in this particular context

20  involving private searches in child pornography cases and

21  hashing -- hash matches, acknowledge that the critical inquiry

22  is whether a reasonable officer at the time would have known

23  that what he was doing was a violation of the law, a violation

24  of a defendant's constitutional rights.

25      In fact, in the one case that is at least factually

38

1     similar to this case and supports the defendant's position,

2     which is *United States v. Keith* -- it was frankly a case that

3     the government cited -- even in that case, the *Keith* court

4     applied the good faith doctrine and said that NCMEC in that

5     case, even though NCMEC had exceeded the scope of the search

6     conducted, I think it was by AOL in that case, that NCMEC had

7     no reason to believe that what they were doing was unlawful or

8     unconstitutional.

9          In this case, Detective Schihl's in the same spot.  He

10    had no reason to believe that, based upon all the information

11    in that CyberTipline report, that he was looking at something

12    that had never been looked at and that was not lawfully being

13    provided to him by an ESP that this defendant had basically

14    contracted with and had voluntarily engaged his services.

15              THE COURT:  Okay.  I guess what concerns me about

16    that most recent point that you just made was -- and again, I

17    understand your position about the factual, the circumstantial

18    applicability of the *Warshak* case to this situation, that it

19    does not apply, but the holding in *Warshak* with respect to

20    expectations of privacy in e-mails, and given Mr. Eckes'

21    comment earlier about precedence and case law playing a role

22    in the good faith exception, why would -- especially since the

23    CyberTipline specifically refers to the fact that these

24    attachments were from an e-mail -- from an e-mail that may or

25    may not have been sent, I think is the way it was referred

1    to -- so why would *Warshak* not be general legal instruction

2    that when we have an e-mail account involved here, there are

3    expectations of privacy that are implicated?

4         MS. LEONHARD:  Because we're not talking about a

5    general search of the entire contents of somebody's e-mail

6    account.  What we're talking about are two attachments of

7    child pornography that had been identified as such, classified

8    as such, described as such.  And we have the situation where

9    when they were uploaded, the ESP terminated his account.  The

10   review by Detective Schihl occurred over a month later.

11        So again, if there is a way that I can conceptualize and

12   sort of convey the conceptualization accurately, it would be

13   *Warshak* is the overarching umbrella, but that's not -- these

14   facts, sort of funneled down, leave no reasonable expectation

15   of privacy in the e-mail attachments.  And any claim by this

16   defendant that he had some sort of possessory interest in

17   those e-mail attachments fails as a matter of law because you

18   can't have a possessory interest in contraband.

19        THE COURT:  But Detective Schihl wouldn't have known

20   at the time that he received the CyberTipline report that the

21   account had been closed.  Right?

22        MS. LEONHARD:  Does that go to -- I don't think there

23   was any information in the CyberTipline report about the

24   status of the e-mail account.

25        THE COURT:  All right.

40

1          MS. LEONHARD:  And so in this case, another reason

2     why good faith -- in the end, for the reasons I've already

3     stated, the private search doctrine applies and insulates the

4     viewing of the images by Detective Schihl because essentially

5     the contents were already known.  This defendant did not have

6     any reasonable expectation of privacy in those two e-mail

7     attachments given that his -- basically his contract had been

8     terminated at that point.  But even if the Court disagrees

9     with the United States on both of those points, good faith

10    still applies.

11         Good faith -- basically, the Court in *Leon* said the

12    exclusionary rule, the purpose, the design of the exclusionary

13    rule, is to deter bad conduct.  Nobody wants law enforcement

14    out there doing things that they're not supposed to do,

15    especially when they know they're not supposed to be doing

16    this.

17         What is there to deter here?  This detective received, in

18    one parcel, part and parcel of the CyberTipline report, the

19    PDF report and the images.  He reviews it all.  What's the

20    first thing he does?  He gets a warrant for the actual

21    contents of the e-mail account.  That's what *Warshak* requires.

22    That's what everybody wants.  That's what he did.  One

23    warrant, followed by another warrant, followed by another

24    warrant.  And so to put this in the category of reckless,

25    negligent, bad behavior by law enforcement is completely

1    inappropriate.  That's not what happened in this case.  There

2    is nothing to deter.

3        And so in the end, even if the Court disagrees with the

4    government on the merits about private search, reasonable

5    expectation of privacy, there's nothing, no reckless, no bad

6    conduct, to deter in this case because at every stage

7    Detective Schihl did what the law requires.

8            THE COURT:  All right.

9            MS. LEONHARD:  Can I add one more thing?

10           THE COURT:  Yes.

11           MS. LEONHARD:  The only reason why the United States

12   brought up and mentioned the independent source doctrine is, I

13   frankly was not clear about how far the defense is arguing

14   that the fruit of the poisonous tree doctrine extends in this

15   case.  I agree with Mr. Eckes that.  If you excise the portion

16   of the affidavit for the g-mail account about Detective

17   Schihl's review of these images, probable cause doesn't exist

18   on that warrant.  But I wasn't exactly sure if he was then

19   arguing that subsequent the warrant for the house is tainted

20   and the warrant for the media seized from the house was

21   tainted as well.  Because I think if you excise the

22   description or the review of the images from those warrants, I

23   think there's -- I think the independent source doctrine does

24   save those warrants.

25           THE COURT:  Well, so let's take, for example, once

42

1     the results came in from the g-mail account and we move to the

2     next warrant for the house, I think it was.

3              MS. LEONHARD:  Yes.

4              THE COURT:  Then at that point, my recollection of

5     reading that affidavit was there was a description of the

6     images that were viewed originally that came in from the

7     CyberTipline, and there was also additional information about

8     the g-mail accounts, information from the e-mails that were

9     sent that way.  So I believe, as I'm understanding it,

10    Mr. Eckes' argument is that both of those pieces of evidence,

11    so to speak, would have to be stricken from the warrant

12    application for the home.

13        Is that correct, Mr. Eckes?

14             MR. ECKES:  Yes, Your Honor.

15             MS. LEONHARD:  Any information -- if the Court

16    disagrees with the government, any information that was the

17    result of the search warrant executed on the g-mail account, I

18    agree, would have to be excised.  But I do not concede that

19    probable cause does not exist in the affidavit in support of

20    the search warrant for the house.

21             THE COURT:  Okay.  And what would the government's

22    position be on what would have to be excised from that

23    affidavit?

24             MS. LEONHARD:  Anything -- I don't have it in front

25    of me, but I know that Detective Schihl's review of the images

43

1    and any other information that was gleaned from reviewing the

2    responsive information provided by Google.  So if there was

3    information -- I think there was a description about he

4    reviewed certain images and there were eight images that

5    depicted --

6              THE COURT:  What about the e-mail account itself

7    then?  The results from that first search warrant, you're

8    saying that would not have to be removed from that

9    application?

10             MS. LEONHARD:  I know there was subscriber

11   information that was provided as a result of the search

12   warrant that was served on Google.  That's frankly noncontent

13   information.  That's information that could have been obtained

14   frankly by subpoena, so I'm not willing to concede that that

15   would have to be excised as a result.

16             THE COURT:  But what about the description of what

17   was contained within the e-mails?

18             MS. LEONHARD:  I think it should.  I think that would

19   be responsive information about the content of the e-mail

20   account that was the subject of the search warrant.  It would

21   need to be excised.

22             THE COURT:  Okay.  All right.  So how is it, then,

23   that you are -- and I know we don't have the stuff in front of

24   us here, but how is it that you're maintaining that the search

25   warrant -- if this all came to pass that I'm actually

1    analyzing the independent source rule, that the search warrant

2    for the home is valid if that information is excised?

3            MS. LEONHARD:  Your Honor, when we did the initial

4    briefing, my thought was even if you excised that, that

5    probable cause would still exist.  And that would be my

6    argument at this point.  Because then there was an additional

7    follow-up -- there was an additional search warrant

8    separately --

9            THE COURT:  On the two --

10           MS. LEONHARD:  -- to authorize the forensic

11   examination of the devices seized.  I would also note, just

12   for the record, that those devices were also subject of a

13   separate federal search warrant that was sworn out by Special

14   Agent McGrath.

15           THE COURT:  And that was -- was that the warrant that

16   was signed by Judge Wier?

17           MS. LEONHARD:  Correct.  Correct.

18           THE COURT:  Okay.  So you're saying all of those

19   devices that were recovered from the warrant for the search of

20   the home, those have been examined again pursuant to a

21   separate warrant that issued on separate probable cause?

22           MS. LEONHARD:  Correct.

23           THE COURT:  Okay.

24           MS. LEONHARD:  Probable cause -- an affidavit that

25   referred not at all to the Google search warrant or the

1    results produced.

2            THE COURT:  Okay.  All right.  All right.  Thank you.

3    Thank you.

4        Mr. Eckes, is there anything further that you'd like to

5    close us out with?

6            MR. ECKES:  Just briefly, Your Honor.  I don't

7    think -- there was some confusion on -- sorry.

8            THE COURT:  That's all right.

9            MR. ECKES:  *Lichtenberger* was cited --

10           THE COURT:  I think by both of you.

11           MR. ECKES:  Right.  But back by the United States in

12   its argument, it seemed to be somewhat related to good faith.

13   And I don't think that it ultimately is relevant to the good

14   faith argument; that what matters -- and I think that the

15   Court -- that's why I'm going to be brief -- hit the nail on

16   the head -- is with *Warshak*.

17       I mean, *Warshak* says specifically the good faith analysis

18   has changed and a reasonable officer may no longer assume the

19   Constitution permits warrantless searches of private e-mails.

20   The reason that's so important is I get that it was in a

21   different context because that officer had relied on the

22   statutory scheme that suggested you could search -- or you

23   could subpoena e-mail records, but the thrust is clear that

24   you need warrants to look at e-mails.  And that's binding law

25   before this Court.

1        THE COURT:  Well, unless it was looked at in the

2   private search.

3        MR. ECKES:  Right.

4        THE COURT:  Right?

5        MR. ECKES:  Unless the e-mail had been -- had been

6   looked at with a private search.  And that takes us down the

7   road we've been, I don't need to exhaust any more, on whether

8   they had been inside that file or not.  I don't think that it

9   is akin to an x-ray, a hash value creation of a different

10  file, if any.  I don't know what would be the x-ray, but it's

11  certainly not x-ray of this later container, the opening and

12  reviewing of a prior container.

13       THE COURT:  The matching process, almost like DNA.

14  Seems more analogous to a DNA type of situation than maybe an

15  x-ray situation, as far as what I'm thinking of mentally is

16  the matching aspect that goes on.  Or fingerprint.  We do

17  matching with fingerprints.

18       MR. ECKES:  Right.  I think the search that I'm

19  suggesting Google made, I think the Court's right.  It's like

20  putting DNA into a CODIS, the Google search.  But the opening

21  of the e-mails is not like that is what I'm saying.

22       THE COURT:  Right.  Right.  It's just what's still

23  troubling for me, though, is that whole development of the

24  hash value situation; is that analogous to essentially a

25  digital eye.

1          MR. ECKES:  And I believe for the Court to find that

2      would be an expansion of *Jacobsen*, and I don't believe that's

3      where the law will go, in light of the technology aspect in

4      your *Riley* case.  And *Lichtenberger*, I think, even cites to

5      the idea that -- you know, of enhanced privacy rights when

6      we're dealing with technology going forward.

7          THE COURT:  That is the government's use, right?  The

8      government's use of --

9          MR. ECKES:  It was.

10          THE COURT:  -- devices.

11          MR. ECKES:  It was.  But we're going to come to a day

12      where this private stuff is going to head on with -- as

13      private companies more and more can know everything about

14      someone and then hand it over to the government, and in using,

15      you know, quite detailed technologies.  But be that as it may,

16      the gist that obviously I've cited to many times in the reply

17      is that, you know, the detective opened an unopened container,

18      and you need a warrant for that.  And regardless of his

19      subjective belief in whether he needed a warrant or whether

20      the Fourth Amendment required it, it's been pretty clear that

21      in that context, you need a warrant; that you need a warrant

22      all through our country's history.

23          THE COURT:  All right.  Thank you, Mr. Eckes.

24      You have reminded me, though, Ms. Leonhard, I do want to

25      give you an opportunity, if you would like it.  We talked at

48

1   the last session about this state actor situation with Google.

2   Is there anything that you wish to provide on that here today

3   or just submit on your brief?

4        MS. LEONHARD:  I don't really think there's more to

5   add.  I think the case law's almost unanimously against the

6   defendant's position that Google acted as a government actor

7   in this case.  I think I cited a litany of authority for that

8   proposition.  No court at this point has held to the contrary.

9   And, in fact, I think there was one court that considered the

10  very sort of entanglement aspect that the defendant raises,

11  and that was the *Richardson* case where the First Circuit said

12  no, even despite that statutory entanglement between NCMEC and

13  Google in that case, that Google still retained its status as

14  a private entity.

15       THE COURT:  Okay.  All right.  Thank you.

16       All right.  Well, thank you very much, Counsel.  I do

17  appreciate your very thoughtful presentations on this.  It's

18  an intriguing situation.  Unless there is anything further

19  that either of you feel like you need to bring to my

20  attention, I will go ahead and close out this hearing, as well

21  as close out the briefing on this, and then go ahead and place

22  it under submission for purposes of a Report & Recommendation

23  for Judge Thapar.

24       Is there anything further that either of you wish to

25  offer?

49

1          MR. ECKES:  No, Your Honor.

2          THE COURT:  Okay.

3          MS. LEONHARD:  No, ma'am.  Thank you.

4          THE COURT:  All right.  Thank you.  Thank you.

5      So, Madam Clerk, we will go ahead and have the motion to

6  suppress that was filed by the defendant, then, taken under

7  advisement, and that will start the next phase of our Speedy

8  Trial calculations with regard to the motion.  Okay.

9      All right.  Very well.  Anything further that we need to

10 address on Mr. Miller's case here this afternoon?  Mr. Eckes?

11         MR. ECKES:  I don't believe so, Judge.  I believe the

12 Court is awaiting, from Ms. Leonhard and I, a status report,

13 so that will be filed once it's all over with.

14         THE COURT:  Okay.

15         MR. ECKES:  We're still working --

16         THE COURT:  Communication still --

17         MR. ECKES:  Still been talking about it --

18         THE COURT:  Okay.

19         MR. ECKES:  -- and working on updates.

20         THE COURT:  Okay.  Great.

21         MS. LEONHARD:  Nothing further from the government.

22 Thank you.

23         THE COURT:  Thank you very much.

24      All right.  So this case is concluded for today then.

25 And unless -- I do like to check with the probation officer.

50

1    Officer Vonderhaar, is there anything further with

2 respect to Mr. Miller's bond that needs to be addressed this

3 afternoon?

4     THE PROBATION OFFICER:  None, Your Honor.

5     THE COURT:  Okay.  Great.  All right.  So we are in

6 recess with respect to this case, then, and we'll take just a

7 couple of moments before we start with our next matter, which

8 I think both of you are on as well, the Moran matter.  Thank

9 you.

10   (Proceedings concluded at 3:18 p.m.)

11         -  -  -

12       C E R T I F I C A T E

13    I, JOAN LAMPKE AVERDICK, RDR, CRR, certify that
the foregoing is a correct transcript from the record of
14 proceedings in the above-entitled case.

15 \s\ Joan Lampke Averdick   July 25, 2018
JOAN LAMPKE AVERDICK, RDR, CRR Date of Certification
16 Official Court Reporter

17

18

19

20

21

22

23

24

25